# UNITED STATES *v.* SCHEFFER

No. 96–1133.   Argued November 3, 1997—Decided March 31, 1998

THOMAS, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, and II–D, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined, and an opinion with respect to Parts II–B and II–C, in which REHNQUIST, C. J., and SCALIA and SOUTER, JJ., joined. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which O'CONNOR, GINSBURG, and BREYER, JJ., joined, *post*, p. 318. STEVENS, J., filed a dissenting opinion, *post*, p. 320.

*Deputy Solicitor General Dreeben* argued the cause for the United States. With him on the briefs were *Acting Solicitor General Dellinger, Acting Solicitor General Waxman, Acting Assistant Attorney General Keeney, David C. Frederick, Joel M. Gershowitz,* and *Michael J. Breslin.*

*Kim L. Sheffield* argued the cause for respondent. With her on the brief were *Carol L. Hubbard, Michael L. McIntyre, Robin S. Wink,* and *W. Craig Mullen.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Connecticut et al. by *John M. Bailey,* Chief State's Attorney of Connecticut, and *Judith Rossi,* Senior Assistant State's Attorney, and by the Attorneys General for their respective jurisdictions as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Winston Bryant* of Arkansas, *Daniel E. Lungren* of California, *M. Jane Brady* of Delaware, *Thurbert E. Baker*

JUSTICE THOMAS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, and II–D, and an opinion with respect to Parts II–B and II–C, in which THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE SOUTER join.

This case presents the question whether Military Rule of Evidence 707, which makes polygraph evidence inadmissible in court-martial proceedings, unconstitutionally abridges the right of accused members of the military to present a defense. We hold that it does not.

## I

In March 1992, respondent Edward Scheffer, an airman stationed at March Air Force Base in California, volunteered to work as an informant on drug investigations for the Air Force Office of Special Investigations (OSI). His OSI supervisors advised him that, from time to time during the course of his undercover work, they would ask him to submit to drug testing and polygraph examinations. In early April,

---

of Georgia, *Jeffrey A. Modisett* of Indiana, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.*, of Maryland, *Scott Harshbarger* of Massachusetts, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Betty D. Montgomery* of Ohio, *Drew Edmondson* of Oklahoma, *D. Michael Fisher* of Pennsylvania, *Jeffrey B. Pine* of Rhode Island, *Charles Molony Condon* of South Carolina, *Richard Cullen* of Virginia, *Christine O. Gregoire* of Washington, *Robert A. Butterworth* of Florida, and *William U. Hill* of Wyoming; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson.*

Briefs of *amici curiae* urging affirmance were filed for the American Polygraph Association by *Gordon L. Vaughan;* for the United States Army Defense Appellate Division by *John T. Phelps II;* for the Committee of Concerned Social Scientists by *Charles F. Peterson;* for the National Association of Criminal Defense Lawyers by *Charles W. Daniels* and *Barbara E. Bergman;* and for the United States Navy-Marine Corps Appellate Defense Division by *Syed N. Ahmad.*

one of the OSI agents supervising respondent requested that he submit to a urine test. Shortly after providing the urine sample, but before the results of the test were known, respondent agreed to take a polygraph test administered by an OSI examiner. In the opinion of the examiner, the test "indicated no deception" when respondent denied using drugs since joining the Air Force.[1]

On April 30, respondent unaccountably failed to appear for work and could not be found on the base. He was absent without leave until May 13, when an Iowa state patrolman arrested him following a routine traffic stop and held him for return to the base. OSI agents later learned that respondent's urinalysis revealed the presence of methamphetamine.

Respondent was tried by general court-martial on charges of using methamphetamine, failing to go to his appointed place of duty, wrongfully absenting himself from the base for 13 days, and, with respect to an unrelated matter, uttering 17 insufficient funds checks. He testified at trial on his own behalf, relying upon an "innocent ingestion" theory and denying that he had knowingly used drugs while working for OSI. On cross-examination, the prosecution attempted to impeach respondent with inconsistencies between his trial testimony and earlier statements he had made to OSI.

Respondent sought to introduce the polygraph evidence in support of his testimony that he did not knowingly use drugs. The military judge denied the motion, relying on Military Rule of Evidence 707, which provides, in relevant part:

> "(a) Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take,

---

[1] The OSI examiner asked three relevant questions: (1) "Since you've been in the [Air Force], have you used any illegal drugs?"; (2) "Have you lied about any of the drug information you've given OSI?"; and (3) "Besides your parents, have you told anyone you're assisting OSI?" Respondent answered "no" to each question. App. 12.

failure to take, or taking of a polygraph examination, shall not be admitted into evidence."

The military judge determined that Rule 707 was constitutional because "the President may, through the Rules of Evidence, determine that credibility is not an area in which a fact finder needs help, and the polygraph is not a process that has sufficient scientific acceptability to be relevant."[2] App. 28. He further reasoned that the factfinder might give undue weight to the polygraph examiner's testimony, and that collateral arguments about such evidence could consume "an inordinate amount of time and expense." *Ibid.*

Respondent was convicted on all counts and was sentenced to a bad-conduct discharge, confinement for 30 months, total forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The Air Force Court of Criminal Appeals affirmed in all material respects, explaining that Rule 707 "does not arbitrarily limit the accused's ability to present reliable evidence." 41 M. J. 683, 691 (1995) (en banc).

By a 3-to-2 vote, the United States Court of Appeals for the Armed Forces reversed. 44 M. J. 442 (1996). Without pointing to any particular language in the Sixth Amendment, the Court of Appeals held that "[a] *per se* exclusion of polygraph evidence offered by an accused to rebut an attack on his credibility . . . violates his Sixth Amendment right to present a defense." *Id.*, at 445.[3] Judge Crawford, dissent-

---

[2] Article 36 of the Uniform Code of Military Justice authorizes the President, as Commander in Chief of the Armed Forces, see U. S. Const., Art. II, § 2, to promulgate rules of evidence for military courts: "Pretrial, trial, and post-trial procedures, including modes of proof, . . . may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts." 10 U. S. C. § 836(a).

[3] In this Court, respondent cites the Sixth Amendment's Compulsory Process Clause as the specific constitutional provision supporting his claim. He also briefly contends that the "combined effect" of the Fifth and Sixth Amendments confers upon him the right to a "'meaningful op-

ing, stressed that a defendant's right to present relevant evidence is not absolute, that relevant evidence can be excluded for valid reasons, and that Rule 707 was supported by a number of valid justifications. *Id.,* at 449–451. We granted certiorari, 520 U. S. 1227 (1997), and we now reverse.

## II

A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions.[4] See *Taylor* v. *Illinois,* 484 U. S. 400, 410 (1988); *Rock* v. *Arkansas,* 483 U. S. 44, 55 (1987); *Chambers* v. *Mississippi,* 410 U. S. 284, 295 (1973). A defendant's interest in presenting such evidence may thus " 'bow to accommodate other legitimate interests in the criminal trial process.' " *Rock, supra,* at 55 (quoting *Chambers, supra,* at 295); accord, *Michigan* v. *Lucas,* 500 U. S. 145, 149 (1991). As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *Rock, supra,* at 56; accord, *Lucas, supra,* at 151. Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused. See *Rock, supra,* at 58; *Chambers, supra,* at 302; *Washington* v. *Texas,* 388 U. S. 14, 22–23 (1967).

---

portunity to present a complete defense,' " *Crane* v. *Kentucky,* 476 U. S. 683, 690 (1986) (citations omitted), and that this right in turn encompasses a constitutional right to present polygraph evidence to bolster his credibility.

[4] The words "defendant" and "jury" are used throughout in reference to general principles of law and in discussing nonmilitary precedents. In reference to this case or to the military specifically, the terms "court," "court members," or "court-martial" are used throughout, as is the military term "accused," rather than the civilian term "defendant."

Rule 707 serves several legitimate interests in the criminal trial process. These interests include ensuring that only reliable evidence is introduced at trial, preserving the court members' role in determining credibility, and avoiding litigation that is collateral to the primary purpose of the trial.[5] The Rule is neither arbitrary nor disproportionate in promoting these ends. Nor does it implicate a sufficiently weighty interest of the defendant to raise a constitutional concern under our precedents.

### A

State and Federal Governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial. Indeed, the exclusion of unreliable evidence is a principal objective of many evidentiary rules. See, e. g., Fed. Rules Evid. 702, 802, 901; see also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U. S. 579, 589 (1993).

The contentions of respondent and the dissent notwithstanding, there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques. 1 D. Faigman, D. Kaye, M. Saks, & J. Sanders, Modern Scientific Evidence 565, n. †, § 14–2.0 to § 14–7.0 (1997); see also 1 P. Giannelli & E. Imwinkelried, Scientific

---

[5] These interests, among others, were recognized by the drafters of Rule 707, who justified the Rule on the following grounds: the risk that court members would be misled by polygraph evidence; the risk that the traditional responsibility of court members to ascertain the facts and adjudge guilt or innocence would be usurped; the danger that confusion of the issues "'could result in the court-martial degenerating into a trial of the polygraph machine;'" the likely waste of time on collateral issues; and the fact that the "'reliability of polygraph evidence has not been sufficiently established.'" See 41 M. J. 683, 686 (USAF Ct. Crim. App. 1995) (citing Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence, App. 22, p. A22–46 (1994 ed.)).

Evidence § 8–2(C), pp. 225–227 (2d ed. 1993) (hereinafter Giannelli & Imwinkelried); 1 J. Strong, McCormick on Evidence § 206, p. 909 (4th ed. 1992) (hereinafter McCormick). Some studies have concluded that polygraph tests overall are accurate and reliable. See, e. g., S. Abrams, The Complete Polygraph Handbook 190–191 (1989) (reporting the overall accuracy rate from laboratory studies involving the common "control question technique" polygraph to be "in the range of 87 percent"). Others have found that polygraph tests assess truthfulness significantly less accurately—that scientific field studies suggest the accuracy rate of the "control question technique" polygraph is "little better than could be obtained by the toss of a coin," that is, 50 percent. See Iacono & Lykken, The Scientific Status of Research on Polygraph Techniques: The Case Against Polygraph Tests, in 1 Modern Scientific Evidence, supra, § 14–5.3, at 629 (hereinafter Iacono & Lykken).[6]

This lack of scientific consensus is reflected in the disagreement among state and federal courts concerning both the

---

[6] The United States notes that in 1983 Congress' Office of Technology Assessment evaluated all available studies on the reliability of polygraphs and concluded that "'[o]verall, the cumulative research evidence suggests that when used in criminal investigations, the polygraph test detects deception better than chance, but with error rates that could be considered significant.'" Brief for United States 21 (quoting U. S. Congress, Office of Technology Assessment, Scientific Validity of Polygraph Testing: A Research Review and Evaluation—A Technical Memorandum 5 (OTA-TM-H–15, Nov. 1983)). Respondent, however, contends current research shows polygraph testing is reliable more than 90 percent of the time. Brief for Respondent 22, and n. 19 (citing J. Matte, Forensic Psychophysiology Using the Polygraph 121–129 (1996)). Even if the basic debate about the reliability of polygraph technology itself were resolved, however, there would still be controversy over the efficacy of countermeasures, or deliberately adopted strategies that a polygraph examinee can employ to provoke physiological responses that will obscure accurate readings and thus "fool" the polygraph machine and the examiner. See, e. g., Iacono & Lykken § 14–3.0.

admissibility and the reliability of polygraph evidence.[7] Although some Federal Courts of Appeals have abandoned the *per se* rule excluding polygraph evidence, leaving its admission or exclusion to the discretion of district courts under *Daubert,* see, *e. g., United States* v. *Posado,* 57 F. 3d 428, 434 (CA5 1995); *United States* v. *Cordoba,* 104 F. 3d 225, 228 (CA9 1997), at least one Federal Circuit has recently reaffirmed its *per se* ban, see *United States* v. *Sanchez,* 118 F. 3d 192, 197 (CA4 1997), and another recently noted that it has "not decided whether polygraphy has reached a sufficient state of reliability to be admissible." *United States* v. *Messina,* 131 F. 3d 36, 42 (CA2 1997). Most States maintain *per se* rules excluding polygraph evidence. See, *e. g., State* v. *Porter,* 241 Conn. 57, 92–95, 698 A. 2d 739, 758–759 (1997); *People* v. *Gard,* 158 Ill. 2d 191, 202–204, 632 N. E. 2d 1026, 1032 (1994); *In re Odell,* 672 A. 2d 457, 459 (RI 1996) *(per curiam); Perkins* v. *State,* 902 S. W. 2d 88, 94–95 (Ct. App. Tex. 1995). New Mexico is unique in making polygraph evidence generally admissible without the prior stipulation of the parties and without significant restriction. See N. M.

---

[7] Until quite recently, federal and state courts were uniform in categorically ruling polygraph evidence inadmissible under the test set forth in *Frye* v. *United States,* 293 F. 1013 (CADC 1923), which held that scientific evidence must gain the general acceptance of the relevant expert community to be admissible. In *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U. S. 579 (1993), we held that *Frye* had been superseded by the Federal Rules of Evidence and that expert testimony could be admitted if the district court deemed it both relevant and reliable.

Prior to *Daubert,* neither federal nor state courts found any Sixth Amendment obstacle to the categorical rule. See, *e. g., Bashor* v. *Risley,* 730 F. 2d 1228, 1238 (CA9), cert. denied, 469 U. S. 838 (1984); *People* v. *Price,* 1 Cal. 4th 324, 419–420, 821 P. 2d 610, 663 (1991), cert. denied, 506 U. S. 851 (1992). Nothing in *Daubert* foreclosed, as a constitutional matter, *per se* exclusionary rules for certain types of expert or scientific evidence. It would be an odd inversion of our hierarchy of laws if altering or interpreting a rule of evidence worked a corresponding change in the meaning of the Constitution.

Rule Evid. § 11–707.[8]  Whatever their approach, state and federal courts continue to express doubt about whether such evidence is reliable.  See, *e. g., United States* v. *Messina, supra,* at 42; *United States* v. *Posado, supra,* at 434; *State* v. *Porter, supra,* at 126–127, 698 A. 2d, at 774; *Perkins* v. *State, supra,* at 94; *People* v. *Gard, supra,* at 202–204, 632 N. E. 2d, at 1032; *In re Odell, supra,* at 459.

The approach taken by the President in adopting Rule 707—excluding polygraph evidence in all military trials—is a rational and proportional means of advancing the legitimate interest in barring unreliable evidence.  Although the degree of reliability of polygraph evidence may depend upon a variety of identifiable factors, there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams.  Individual jurisdictions therefore may reasonably reach differing conclusions as to whether polygraph evidence should be admitted.  We cannot say, then, that presented with such widespread uncertainty, the President acted arbitrarily or disproportionately in promulgating a *per se* rule excluding all polygraph evidence.

### B

It is equally clear that Rule 707 serves a second legitimate governmental interest: Preserving the court members' core

---

[8] Respondent argues that because the Government—and in particular the Department of Defense—routinely uses polygraph testing, the Government must consider polygraphs reliable.  Governmental use of polygraph tests, however, is primarily in the field of personnel screening, and to a lesser extent as a tool in criminal and intelligence investigations, but not as evidence at trials.  See Brief for United States 34, n. 17; Barland, The Polygraph Test in the USA and Elsewhere, in The Polygraph Test 76 (A. Gale ed. 1988).  Such limited, out of court uses of polygraph techniques obviously differ in character from, and carry less severe consequences than, the use of polygraphs as evidence in a criminal trial.  They do not establish the reliability of polygraphs as trial evidence, and they do not invalidate reliability as a valid concern supporting Rule 707's categorical ban.

function of making credibility determinations in criminal trials. A fundamental premise of our criminal trial system is that "the *jury* is the lie detector." *United States* v. *Barnard*, 490 F. 2d 907, 912 (CA9 1973) (emphasis added), cert. denied, 416 U. S. 959 (1974). Determining the weight and credibility of witness testimony, therefore, has long been held to be the "part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." *Aetna Life Ins. Co.* v. *Ward*, 140 U. S. 76, 88 (1891).

By its very nature, polygraph evidence may diminish the jury's role in making credibility determinations. The common form of polygraph test measures a variety of physiological responses to a set of questions asked by the examiner, who then interprets these physiological correlates of anxiety and offers an opinion to the jury about whether the witness—often, as in this case, the accused—was deceptive in answering questions about the very matters at issue in the trial. See 1 McCormick § 206.[9] Unlike other expert witnesses who testify about factual matters outside the jurors' knowledge, such as the analysis of fingerprints, ballistics, or DNA found at a crime scene, a polygraph expert can supply the jury only with another opinion, in addition to its own, about whether the witness was telling the truth. Jurisdictions, in promulgating rules of evidence, may legitimately be concerned about the risk that juries will give excessive

---

[9] The examiner interprets various physiological responses of the examinee, including blood pressure, perspiration, and respiration, while asking a series of questions, commonly in three categories: direct accusatory questions concerning the matter under investigation, irrelevant or neutral questions, and more general "control" questions concerning wrongdoing by the subject in general. The examiner forms an opinion of the subject's truthfulness by comparing the physiological reactions to each set of questions. See generally Giannelli & Imwinkelried 219–222; Honts & Quick, The Polygraph in 1995: Progress in Science and the Law, 71 N. D. L. Rev. 987, 990–992 (1995).

weight to the opinions of a polygrapher, clothed as they are in scientific expertise and at times offering, as in respondent's case, a conclusion about the ultimate issue in the trial. Such jurisdictions may legitimately determine that the aura of infallibility attending polygraph evidence can lead jurors to abandon their duty to assess credibility and guilt. Those jurisdictions may also take into account the fact that a judge cannot determine, when ruling on a motion to admit polygraph evidence, whether a particular polygraph expert is likely to influence the jury unduly. For these reasons, the President is within his constitutional prerogative to promulgate a *per se* rule that simply excludes all such evidence.

## C

A third legitimate interest served by Rule 707 is avoiding litigation over issues other than the guilt or innocence of the accused. Such collateral litigation prolongs criminal trials and threatens to distract the jury from its central function of determining guilt or innocence. Allowing proffers of polygraph evidence would inevitably entail assessments of such issues as whether the test and control questions were appropriate, whether a particular polygraph examiner was qualified and had properly interpreted the physiological responses, and whether other factors such as countermeasures employed by the examinee had distorted the exam results. Such assessments would be required in each and every case.[10] It thus offends no constitutional principle for the President to conclude that a *per se* rule excluding all polygraph evidence is appropriate. Because litigation over the admissibility of polygraph evidence is by its very nature col-

---

[10] Although some of this litigation could take place outside the presence of the jury, at the very least a foundation must be laid for the jury to assess the qualifications and skill of the polygrapher and the validity of the exam, and significant cross-examination could occur on these issues.

lateral, a *per se* rule prohibiting its admission is not an arbitrary or disproportionate means of avoiding it.[11]

## D

The three of our precedents upon which the Court of Appeals principally relied, *Rock* v. *Arkansas, Washington* v. *Texas,* and *Chambers* v. *Mississippi,* do not support a right to introduce polygraph evidence, even in very narrow circumstances. The exclusions of evidence that we declared unconstitutional in those cases significantly undermined fundamental elements of the defendant's defense. Such is not the case here.

In *Rock,* the defendant, accused of a killing to which she was the only eyewitness, was allegedly able to remember the facts of the killing only after having her memory hypnotically refreshed. See *Rock* v. *Arkansas,* 483 U. S., at 46. Because Arkansas excluded all hypnotically refreshed testimony, the defendant was unable to testify about certain relevant facts, including whether the killing had been accidental. See *id.,* at 47–49. In holding that the exclusion of this evidence violated the defendant's "right to present a defense," we noted that the rule deprived the jury of the testimony of the only witness who was at the scene and had firsthand knowledge of the facts. See *id.,* at 57. Moreover, the rule infringed upon the defendant's interest in testifying in her own defense—an interest that we deemed particularly significant, as it is the defendant who is the target of any crimi-

---

[11] Although the Court of Appeals stated that it had "merely remove[d] the obstacle of the *per se* rule against admissibility" of polygraph evidence in cases where the accused wishes to proffer an exculpatory polygraph to rebut an attack on his credibility, 44 M. J. 442, 446 (1996), and respondent thus implicitly argues that the Constitution would require collateral litigation only in such cases, we cannot see a principled justification whereby a right derived from the Constitution could be so narrowly contained.

nal prosecution. See *id.*, at 52. For this reason, we stated that a defendant ought to be allowed "to present his own version of events in his own words." *Ibid.*

In *Washington*, the statutes involved prevented co-defendants or coparticipants in a crime from testifying for one another and thus precluded the defendant from introducing his accomplice's testimony that the accomplice had in fact committed the crime. See *Washington* v. *Texas*, 388 U. S., at 16–17. In reversing Washington's conviction, we held that the Sixth Amendment was violated because "the State arbitrarily denied [the defendant] the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed." *Id.*, at 23.[12]

In *Chambers*, we found a due process violation in the combined application of Mississippi's common-law "voucher rule," which prevented a party from impeaching his own witness, and its hearsay rule that excluded the testimony of three persons to whom that witness had confessed. See *Chambers* v. *Mississippi*, 410 U. S., at 302. *Chambers* specifically confined its holding to the "facts and circumstances" presented in that case; we thus stressed that the ruling did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." *Id.*, at 302–303. *Chambers* therefore does not stand for the proposition that the defendant is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence.

*Rock, Washington,* and *Chambers* do not require that Rule 707 be invalidated, because, unlike the evidentiary rules at issue in those cases, Rule 707 does not implicate any signifi-

---

[12] In addition, we noted that the State of Texas could advance no legitimate interests in support of the evidentiary rules at issue, and those rules burdened only the defense and not the prosecution. See 388 U. S., at 22–23. Rule 707 suffers from neither of these defects.

cant interest of the accused. Here, the court members heard all the relevant details of the charged offense from the perspective of the accused, and the Rule did not preclude him from introducing any factual evidence.[13] Rather, respondent was barred merely from introducing expert opinion testimony to bolster his own credibility. Moreover, in contrast to the rule at issue in *Rock,* Rule 707 did not prohibit respondent from testifying on his own behalf; he freely exercised his choice to convey his version of the facts to the court-martial members. We therefore cannot conclude that respondent's defense was significantly impaired by the exclusion of polygraph evidence. Rule 707 is thus constitutional under our precedents.

\* \* \*

For the foregoing reasons, Military Rule of Evidence 707 does not unconstitutionally abridge the right to present a defense. The judgment of the Court of Appeals is reversed.

*It is so ordered.*

---

[13] The dissent suggests, *post,* at 331, that polygraph results constitute "factual evidence." The raw results of a polygraph exam—the subject's pulse, respiration, and perspiration rates—may be factual data, but these are not introduced at trial, and even if they were, they would not be "facts" about the alleged crime at hand. Rather, the evidence introduced is the expert opinion testimony of the polygrapher about whether the subject was truthful or deceptive in answering questions about the alleged crime. A *per se* rule excluding polygraph results therefore does not prevent an accused—just as it did not prevent respondent here—from introducing factual evidence or testimony about the crime itself, such as alibi witness testimony, see *ibid.* For the same reasons, an expert polygrapher's interpretation of polygraph results is not evidence of "'the accused's whole conduct,'" see *post,* at 336, to which Dean Wigmore referred. It is not evidence of the "'accused's . . . conduct'" at all, much less "conduct" concerning the actual crime at issue. It is merely the opinion of a witness with no knowledge about any of the facts surrounding the alleged crime, concerning whether the defendant spoke truthfully or deceptively on another occasion.

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR, JUS-
TICE GINSBURG, and JUSTICE BREYER join, concurring in
part and concurring in the judgment.

I join Parts I, II–A, and II–D of the opinion of the Court.

In my view it should have been sufficient to decide this
case to observe, as the principal opinion does, that various
courts and jurisdictions "may reasonably reach differing
conclusions as to whether polygraph evidence should be
admitted." *Ante,* at 312. The continuing, good-faith dis-
agreement among experts and courts on the subject of poly-
graph reliability counsels against our invalidating a *per se*
exclusion of polygraph results or of the fact an accused has
taken or refused to take a polygraph examination. If we
were to accept respondent's position, of course, our holding
would bind state courts, as well as military and federal
courts. Given the ongoing debate about polygraphs, I agree
the rule of exclusion is not so arbitrary or disproportionate
that it is unconstitutional.

I doubt, though, that the rule of *per se* exclusion is wise,
and some later case might present a more compelling case
for introduction of the testimony than this one does.
Though the considerable discretion given to the trial court
in admitting or excluding scientific evidence is not a constitu-
tional mandate, see *Daubert* v. *Merrell Dow Pharmaceuti-
cals, Inc.,* 509 U. S. 579, 587 (1993), there is some tension
between that rule and our holding today. And, as JUSTICE
STEVENS points out, there is much inconsistency between
the Government's extensive use of polygraphs to make vital
security determinations and the argument it makes here,
stressing the inaccuracy of these tests.

With all respect, moreover, it seems the principal opinion
overreaches when it rests its holding on the additional
ground that the jury's role in making credibility determina-
tions is diminished when it hears polygraph evidence. I am
in substantial agreement with JUSTICE STEVENS' observa-
tion that the argument demeans and mistakes the role and

competence of jurors in deciding the factual question of guilt or innocence. *Post,* at 336–337. In the last analysis the principal opinion says it is unwise to allow the jury to hear "a conclusion about the ultimate issue in the trial." *Ante,* at 314. I had thought this tired argument had long since been given its deserved repose as a categorical rule of exclusion. Rule 704(a) of the Federal Rules of Evidence states: "Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." The Advisory Committee's Notes state:

> "The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions. The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. 7 Wigmore §§ 1920, 1921; McCormick § 12. The basis usually assigned for the rule, to prevent the witness from 'usurping the province of the jury,' is aptly characterized as 'empty rhetoric.' 7 Wigmore § 1920, p. 17." Advisory Committee's Notes on Fed. Rule Evid. 704, 28 U. S. C., p. 888.

The principal opinion is made less convincing by its contradicting the rationale of Rule 704 and the well considered reasons the Advisory Committee recited in support of its adoption.

The attempt to revive this outmoded theory is especially inapt in the context of the military justice system; for the one narrow exception to the abolition of the ultimate issue rule still surviving in the Federal Rules of Evidence has been omitted from the corresponding rule adopted for the military. The ultimate issue exception in the Federal Rules of Evidence is as follows:

> "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may

state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone." Fed. Rule Evid. 704(b).

The drafting committee for the Military Rules of Evidence renounced even this remnant. It said: "The statutory qualifications for military court members reduce the risk that military court members will be unduly influenced by the presentation of ultimate opinion testimony from psychiatric experts." Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence, App. 22, p. A22–48 (1995 ed.). Any supposed need to protect the role of the finder of fact is diminished even further by this specific acknowledgment that members of military courts are not likely to give excessive weight to opinions of experts or otherwise to be misled or confused by their testimony. Neither in the federal system nor in the military courts, then, is it convincing to say that polygraph test results should be excluded because of some lingering concern about usurping the jury's responsibility to decide ultimate issues.

JUSTICE STEVENS, dissenting.

The United States Court of Appeals for the Armed Forces held that the President violated the Constitution in June 1991, when he promulgated Rule 707 of the Military Rules of Evidence. Had I been a member of that court, I would not have decided that question without first requiring the parties to brief and argue the antecedent question whether Rule 707 violates Article 36(a) of the Uniform Code of Military Justice, 10 U. S. C. § 836(a). As presently advised, I am persuaded that the Rule does violate the statute and should be held invalid for that reason. I also agree with the Court of Appeals that the Rule is unconstitutional. This Court's contrary holding rests on a serious undervaluation of the importance of the citizen's constitutional right to present a de-

fense to a criminal charge and an unrealistic appraisal of the importance of the governmental interests that undergird the Rule. Before discussing the constitutional issue, I shall comment briefly on the statutory question.

I

Rule 707 is a blanket rule of exclusion.[1]   No matter how reliable and how probative the results of a polygraph test may be, Rule 707 categorically denies the defendant any opportunity to persuade the court that the evidence should be received for any purpose.   Indeed, even if the parties stipulate in advance that the results of a lie detector test may be admitted, the Rule requires exclusion.

The principal charge against the respondent in this case was that he had knowingly used methamphetamine.   His principal defense was "innocent ingestion"; even if the urinalysis test conducted on April 7, 1992, correctly indicated that he did ingest the substance, he claims to have been unaware of that fact.   The results of the lie detector test conducted three days later, if accurate, constitute factual evidence that his physical condition at that time was consistent with the theory of his defense and inconsistent with the theory of the prosecution.   The results were also relevant because they tended to confirm the credibility of his testimony.   Under Rule 707, even if the results of the polygraph test were more reliable than the results of the urinalysis, the weaker evidence is admissible and the stronger evidence is inadmissible.

Under the now discredited reasoning in a case decided 75 years ago, *Frye* v. *United States*, 54 App. D. C. 46, 293

---

[1] Rule 707 states, in relevant part:

"Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence."   Mil. Rule Evid. 707(a).

F. 1013 (1923), that anomalous result would also have been reached in nonmilitary cases tried in the federal courts. In recent years, however, we have not only repudiated *Frye*'s general approach to scientific evidence, but the federal courts have also been engaged in the process of rejecting the once-popular view that all lie detector evidence should be categorically inadmissible.[2] Well reasoned opinions are concluding, consistently with this Court's decisions in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579 (1993), and *General Electric Co.* v. *Joiner*, 522 U. S. 136 (1997), that the federal rules wisely allow district judges to exercise broad discretion when evaluating the admissibility of scientific evidence.[3] Those opinions correctly observe that the rules of evidence generally recognized in the trial of civil and criminal cases in the federal courts do not contain any blanket prohibition against the admissibility of polygraph evidence.

---

[2] "There is no question that in recent years polygraph testing has gained increasingly widespread acceptance as a useful and reliable scientific tool. Because of the advances that have been achieved in the field which have led to the greater use of polygraph examination, coupled with a lack of evidence that juries are unduly swayed by polygraph evidence, we agree with those courts which have found that a per se rule disallowing polygraph evidence is no longer warranted. . . . Thus, we believe the best approach in this area is one which balances the need to admit all relevant and reliable evidence against the danger that the admission of the evidence for a given purpose will be unfairly prejudicial." *United States* v. *Piccinonna*, 885 F. 2d 1529, 1535 (CA11 1989). "[W]e do not now hold that polygraph examinations are scientifically valid or that they will always assist the trier of fact, in this or any other individual case. We merely remove the obstacle of the per se rule against admissibility, which was based on antiquated concepts about the technical ability of the polygraph and legal precepts that have been expressly overruled by the Supreme Court." *United States* v. *Posado*, 57 F. 3d 428, 434 (CA5 1995).

[3] "The per se . . . rule excluding unstipulated polygraph evidence is inconsistent with the 'flexible inquiry' assigned to the trial judge by *Daubert*. This is particularly evident because *Frye*, which was overruled by *Daubert*, involved the admissibility of polygraph evidence." *United States* v. *Cordoba*, 104 F. 3d 225, 227 (CA9 1997).

In accord with the modern trend of decisions on this admissibility issue, in 1987 the Court of Military Appeals held that an accused was "entitled to attempt to lay" the foundation for admission of favorable polygraph evidence. *United States* v. *Gipson*, 24 M. J. 246, 253 (1987). The President responded to *Gipson* by adopting Rule 707. The governing statute authorized him to promulgate evidentiary rules "which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts." 10 U. S. C. § 836(a).[4] Thus, if there are military concerns that warrant a special rule for military tribunals, the statute gives him ample authority to promulgate special rules that take such concerns into account.

Rule 707 has no counterpart in either the Federal Rules of Evidence or the Federal Rules of Criminal Procedure. Moreover, to the extent that the use of the lie detector plays a special role in the military establishment, military practices are more favorable to a rule of admissibility than is the less structured use of lie detectors in the civilian sector of our society. That is so because the military carefully regulates the administration of polygraph tests to ensure reliable results. The military maintains "very stringent standards for polygraph examiners"[5] and has established its own Poly-

---

[4] "Pretrial, trial, and post-trial procedures, including modes of proof, for cases arising under this chapter triable in courts-martial, military commissions and other military tribunals, and procedures for courts of inquiry, may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter." 10 U. S. C. § 836(a).

[5] According to the Department of Defense's 1996 Report to Congress:

"The Department of Defense maintains very stringent standards for polygraph examiners. The Department of Defense Polygraph Institute's basic polygraph program is the only program known to base its curriculum on forensic psychophysiology, and conceptual, abstract, and applied knowl-

graph Institute, which is "generally considered to be the best training facility for polygraph examiners in the United States."[6] The military has administered hundreds of thousands of such tests and routinely uses their results for a wide variety of official decisions.[7]

---

edge that meet the requirements of a master's degree-level of study. Candidates selected for the Department of Defense polygraph positions must meet the following minimum requirements:

"1. Be a United States citizen.

"2. Be at least 25 years of age.

"3. Be a graduate of an accredited four-year college or have equivalent experience that demonstrates the ability to master graduate-level academic courses.

"4. Have two years of experience as an investigator with a Federal or other law enforcement agency. . . .

"5. Be of high moral character and sound emotional temperament, as confirmed by a background investigation.

"6. Complete a Department of Defense-approved course of polygraph instruction.

"7. Be adjudged suitable for the position after being administered a polygraph examination designed to ensure that the candidate realizes, and is sensitive to, the personal impact of such examinations.

"All federal polygraph examiners receive their basic polygraph training at the Department of Defense Polygraph Institute. After completing the basic polygraph training, DoD personnel must serve an internship consisting of a minimum of six months on-the-job-training and conduct at least 25 polygraph examinations under the supervision of a certified polygraph examiner before being certified as a Department of Defense polygraph examiner. In addition, DoD polygraph examiners are required to complete 80 hours of continuing education every two years." Department of Defense Polygraph Program, Annual Polygraph Report to Congress, Fiscal Year 1996, pp. 14–15; see also Yankee, The Current Status of Research in Forensic Psychophysiology and Its Application in the Psychophysiological Detection of Deception, 40 J. Forensic Sciences 63 (1995).

[6] Honts & Perry, Polygraph Admissibility: Changes and Challenges, 16 Law and Human Behavior 357, 359, n. 1 (1992) (hereinafter Honts & Perry).

[7] Between 1981 and 1997, the Department of Defense conducted over 400,000 polygraph examinations to resolve issues arising in counterintelligence, security, and criminal investigations. Department of Defense Polygraph Program, Annual Polygraph Report to Congress, Fiscal Year

The stated reasons for the adoption of Rule 707 do not rely on any special military concern. They merely invoke three interests: (1) the interest in excluding unreliable evidence; (2) the interest in protecting the trier of fact from being misled by an unwarranted assumption that the polygraph evidence has "an aura of near infallibility"; and (3) the interest in avoiding collateral debates about the admissibility of particular test results.

It seems clear that those interests pose less serious concerns in the military than in the civilian context. Disputes about the qualifications of the examiners, the equipment, and the testing procedures should seldom arise with respect to the tests conducted by the military. Moreover, there surely is no reason to assume that military personnel who perform the factfinding function are less competent than ordinary jurors to assess the reliability of particular results, or their relevance to the issues.[8] Thus, there is no identifiable military concern that justifies the President's promulgation of a special military rule that is more burdensome to the accused in military trials than the evidentiary rules applicable to the trial of civilians.

It, therefore, seems fairly clear that Rule 707 does not comply with the statute. I do not rest on this ground, however, because briefing might persuade me to change my views, and because the Court has decided only the constitutional question.

## II

The Court's opinion barely acknowledges that a person accused of a crime has a constitutional right to present a

---

1997, p. 1; *id.*, Fiscal Year 1996, p. 1; *id.*, Fiscal Year 1995, p. 1; *id.*, Fiscal Year 1994, p. 1; *id.*, Fiscal Year 1993, App. A; *id.*, Fiscal Year 1992, App. A; *id.*, Fiscal Year 1991, App. A–1 (reporting information for 1981–1991).

[8] When the members of the court-martial are officers, as was true in this case, they typically have at least a college degree as well as significant military service. See 10 U. S. C. § 825(d)(2); see also, *e. g.*, *United States v. Carter*, 22 M. J. 771, 776 (A. C. M. R. 1986).

defense. It is not necessary to point to "any particular language in the Sixth Amendment," *ante,* at 307, to support the conclusion that the right is firmly established. It is, however, appropriate to comment on the importance of that right before discussing the three interests that the Government relies upon to justify Rule 707.

The Sixth Amendment provides that "the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." Because this right "is an essential attribute of the adversary system itself," we have repeatedly stated that few rights "are more fundamental than that of an accused to present witnesses in his own defense."[9] According to Joseph Story, that provision was included in the Bill of Rights in reaction to a notorious common-law rule categorically excluding defense evidence in treason and felony cases.[10] Our holding in *Washington* v. *Texas,* 388 U. S. 14 (1967), that this right is applicable to the States, rested on the premises that it "is in plain terms the right to present a defense" and that it "is a fundamental element of due proc-

---

[9] "Few rights are more fundamental than that of an accused to present witnesses in his own defense, see, *e. g., Chambers* v. *Mississippi,* 410 U. S. 284, 302 (1973). Indeed, this right is an essential attribute of the adversary system itself. . . . The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact. The right to offer testimony is thus grounded in the Sixth Amendment . . . ." *Taylor* v. *Illinois,* 484 U. S. 400, 408–409 (1988).

[10] "Joseph Story, in his famous Commentaries on the Constitution of the United States, observed that the right to compulsory process was included in the Bill of Rights in reaction to the notorious common-law rule that in cases of treason or felony the accused was not allowed to introduce witnesses in his defense at all. Although the absolute prohibition of witnesses for the defense had been abolished in England by statute before 1787, the Framers of the Constitution felt it necessary specifically to provide that defendants in criminal cases should be provided the means of obtaining witnesses so that their own evidence, as well as the prosecution's, might be evaluated by the jury." *Washington* v. *Texas,* 388 U. S. 14, 19–20 (1967) (footnotes omitted).

ess of law." [11]    Consistent with the history of the provision, the Court in that case held that a state rule of evidence that excluded "whole categories" of testimony on the basis of a presumption of unreliability was unconstitutional. [12]

The blanket rule of inadmissibility held invalid in *Washington* v. *Texas* covered the testimony of alleged accomplices. Both before and after that decision, the Court has recognized the potential injustice produced by rules that exclude entire categories of relevant evidence that is potentially unreliable. At common law interested parties such as defendants, [13] their spouses, [14] and their co-conspirators [15] were not competent

[11] "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Id.*, at 19.

[12] "It is difficult to see how the Constitution is any less violated by arbitrary rules that prevent whole categories of defense witnesses from testifying on the basis of *a priori* categories that presume them unworthy of belief.

"The rule disqualifying an alleged accomplice from testifying on behalf of the defendant cannot even be defended on the ground that it rationally sets apart a group of persons who are particularly likely to commit perjury." *Id.*, at 22.

[13] "It is familiar knowledge that the old common law carefully excluded from the witness stand parties to the record, and those who were interested in the result; and this rule extended to both civil and criminal cases. Fear of perjury was the reason for the rule." *Benson* v. *United States*, 146 U. S. 325, 335 (1892).

[14] "The common-law rule, accepted at an early date as controlling in this country, was that husband and wife were incompetent as witnesses for or against each other. . . .

"The Court recognized that the basic reason underlying th[e] exclusion [of one spouse's testimony on behalf of the other] had been the practice of disqualifying witnesses with a personal interest in the outcome of a case. Widespread disqualifications because of interest, however, had long since

witnesses. "Nor were those named the only grounds of exclusion from the witness stand; conviction of crime, want of religious belief, and other matters were held sufficient. Indeed, the theory of the common law was to admit to the witness stand only those presumably honest, appreciating the sanctity of an oath, unaffected as a party by the result, and free from any of the temptations of interest. The courts were afraid to trust the intelligence of jurors." *Benson* v. *United States*, 146 U. S. 325, 336 (1892). And, of course, under the regime established by *Frye* v. *United States*, scientific evidence was inadmissible unless it met a stringent "general acceptance" test. Over the years, with respect to category after category, strict rules of exclusion have been replaced by rules that broaden the discretion of trial judges to admit potentially unreliable evidence and to allow properly instructed juries to evaluate its weight. While that trend has included both rulemaking and nonconstitutional judicial decisions, the direction of the trend has been consistent and it has been manifested in constitutional holdings as well.

Commenting on the trend that had followed the decision in *Benson*, the Court in 1918 observed that in the

> "years which have elapsed since the decision of the *Benson Case*, the disposition of courts and of legislative bodies to remove disabilities from witnesses has continued, as that decision shows it had been going forward before, under dominance of the conviction of our time that the

---

been abolished both in this country and in England in accordance with the modern trend which permitted interested witnesses to testify and left it for the jury to assess their credibility. Certainly, since defendants were uniformly allowed to testify in their own behalf, there was no longer a good reason to prevent them from using their spouses as witnesses. With the original reason for barring favorable testimony of spouses gone the Court concluded that this aspect of the old rule should go too." *Hawkins* v. *United States*, 358 U. S. 74, 75–76 (1958).

[15] See *Washington* v. *Texas*, 388 U. S., at 20–21.

truth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court, rather than by rejecting witnesses as incompetent, with the result that this principle has come to be widely, almost universally, accepted in this country and in Great Britain." *Rosen* v. *United States,* 245 U. S. 467, 471.

See also *Funk* v. *United States,* 290 U. S. 371, 377–378 (1933). It was in a case involving the disqualification of spousal testimony that Justice Stewart stated: "Any rule that impedes the discovery of truth in a court of law impedes as well the doing of justice." *Hawkins* v. *United States,* 358 U. S. 74, 81 (1958) (concurring opinion).

State evidentiary rules may so seriously impede the discovery of truth, "as well as the doing of justice," that they preclude the "meaningful opportunity to present a complete defense" that is guaranteed by the Constitution, *Crane* v. *Kentucky,* 476 U. S. 683, 690 (1986) (internal quotation marks omitted).[16]  In *Chambers* v. *Mississippi,* 410 U. S. 284, 302

---

[16] "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers* v. *Mississippi,* [410 U. S. 284 (1973)], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, *Washington* v. *Texas,* 388 U. S. 14, 23 (1967); *Davis* v. *Alaska,* 415 U. S. 308 (1974), the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' *California* v. *Trombetta,* 467 U. S. [479, 485 (1984)]; cf. *Strickland* v. *Washington,* 466 U. S. 668, 684–685 (1984) ('The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment'). We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. *In re Oliver,* 333 U. S. 257, 273 (1948); *Grannis* v. *Ordean,* 234 U. S. 385, 394 (1914). That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence

(1973), we concluded that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."[17]   As the Court notes today, restrictions on the "defendant's right to present relevant evidence," *ante*, at 308, must comply with the admonition in *Rock* v. *Arkansas*, 483 U. S. 44, 56 (1987), that they "may not be arbitrary or disproportionate to the purposes they are designed to serve."   Applying that admonition to Arkansas' blanket rule prohibiting the admission of hypnotically refreshed testimony, we concluded that a "State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case." *Id.*, at 61.   That statement of constitutional law is directly relevant to this case.

---

bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence.   In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'   *United States* v. *Cronic*, 466 U. S. 648, 656 (1984).   See also *Washington* v. *Texas*, *supra*, at 22–23."   *Crane* v. *Kentucky*, 476 U. S., at 690–691.

[17] "Few rights are more fundamental than that of an accused to present witnesses in his own defense.   *E. g.*, *Webb* v. *Texas*, 409 U. S. 95 (1972); *Washington* v. *Texas*, 388 U. S. 14, 19 (1967); *In re Oliver*, 333 U. S. 257 (1948).   In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.   Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed.   The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest.   That testimony also was critical to Chambers' defense.   In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers* v. *Mississippi*, 410 U. S., at 302.

## III

The constitutional requirement that a blanket exclusion of potentially unreliable evidence must be proportionate to the purposes served by the rule obviously makes it necessary to evaluate the interests on both sides of the balance. Today the Court all but ignores the strength of the defendant's interest in having polygraph evidence admitted in certain cases. As the facts of this case illustrate, the Court is quite wrong in assuming that the impact of Rule 707 on respondent's defense was not significant because it did not preclude the introduction of any "factual evidence" or prevent him from conveying "his version of the facts to the court-martial members." *Ante,* at 317. Under such reasoning, a rule that excluded the testimony of alibi witnesses would not be significant as long as the defendant is free to testify himself. But given the defendant's strong interest in the outcome—an interest that was sufficient to make his testimony presumptively untrustworthy and therefore inadmissible at common law—his uncorroborated testimony is certain to be less persuasive than that of a third-party witness. A rule that bars him "from introducing expert opinion testimony to bolster his own credibility," *ibid.,* unquestionably impairs any "meaningful opportunity to present a complete defense"; indeed, it is sure to be outcome determinative in many cases.

Moreover, in this case the results of the polygraph test, taken just three days after the urinalysis, constitute independent factual evidence that is not otherwise available and that strongly supports his defense of "innocent ingestion." Just as flight or other evidence of "consciousness of guilt" may sometimes be relevant, on some occasions evidence of "consciousness of innocence" may also be relevant to the central issue at trial. Both the answers to the questions propounded by the examiner, and the physical manifestations produced by those utterances, were probative of an innocent state of mind shortly after he ingested the drugs. In Dean Wigmore's view, both "conduct" and "utterances" may con-

stitute factual evidence of a "consciousness of innocence."[18] As the Second Circuit has held, when there is a serious factual dispute over the "basic defense [that defendant] was unaware of any criminal wrongdoing," evidence of his innocent state of mind is "critical to a fair adjudication of criminal charges."[19] The exclusion of the test results in this case cannot be fairly equated with a ruling that merely prevented the defendant from encumbering the record with cumulative evidence. Because the Rule may well have affected the outcome of the trial, it unquestionably "infringed upon a weighty interest of the accused." *Ante,* at 308.

The question, then, is whether the three interests on which the Government relies are powerful enough to support a categorical rule excluding the results of all polygraph tests no matter how unfair such a rule may be in particular cases.

---

[18] "Moreover, there are other principles by which a defendant may occasionally avail himself of conduct as evidence in his favor—in particular, of conduct indicating consciousness of innocence, . . . of utterances asserting his innocence . . . , and, in sedition charges, of conduct indicating a loyal state of mind . . . ." 1A J. Wigmore, Evidence § 56.1, p. 1180 (Tillers rev. ed. 1983); see *United States* v. *Reifsteck,* 841 F. 2d 701, 705 (CA6 1988).

[19] "Mariotta's basic defense was that he was unaware of any criminal wrongdoing at Wedtech, that he was an innocent victim of the machinations of the sophisticated businessmen whom he had brought into the company to handle its financial affairs. That defense was seriously in issue as to most of the charges against him, drawing considerable support from the evidence. . . .

"With the credibility of the accusations about Mariotta's knowledge of wrongdoing seriously challenged, evidence of his denial of such knowledge in response to an opportunity to obtain immunity by admitting it and implicating others became highly significant to a fair presentation of his defense. . . .

"Where evidence of a defendant's innocent state of mind, critical to a fair adjudication of criminal charges, is excluded, we have not hesitated to order a new trial." *United States* v. *Biaggi,* 909 F. 2d 662, 691–692 (CA2 1990); see also *United States* v. *Bucur,* 194 F. 2d 297 (CA7 1952); *Herman* v. *United States,* 48 F. 2d 479 (CA5 1931).

*Reliability*

There are a host of studies that place the reliability of polygraph tests at 85% to 90%.[20] While critics of the polygraph argue that accuracy is much lower, even the studies cited by the critics place polygraph accuracy at 70%.[21] Moreover, to the extent that the polygraph errs, studies have repeatedly shown that the polygraph is more likely to find innocent people guilty than vice versa.[22] Thus, exculpatory polygraphs—like the one in this case—are likely to be more reliable than inculpatory ones.

Of course, within the broad category of lie detector evidence, there may be a wide variation in both the validity and the relevance[23] of particular test results. Questions about the examiner's integrity, independence, choice of questions, or training in the detection of deliberate attempts to provoke misleading physiological responses may justify exclusion of

---

[20] Raskin, Honts, & Kircher, The Scientific Status of Research on Polygraph Techniques: The Case for Polygraph Tests, in 1 Modern Scientific Evidence 572 (D. Faigman, D. Kaye, M. Saks, & J. Sanders eds. 1997) (hereinafter Faigman) (compiling eight laboratory studies that place mean accuracy at approximately 90%); *id.*, at 575 (compiling four field studies, scored by independent examiners, that place mean accuracy at 90.5%); Raskin, Honts, & Kircher, A Response to Professors Iacono and Lykken, in Faigman 627 (compiling six field studies, scored by original examiners, that place mean accuracy at 97.5%); Abrams, The Complete Polygraph Handbook 190–191 (1989) (compiling 13 laboratory studies that, excluding inconclusive results, place mean accuracy at 87%).

[21] Iacono & Lykken, The Scientific Status of Research on Polygraph Techniques: The Case Against Polygraph Tests, in Faigman 608 (compiling three studies that place mean accuracy at 70%).

[22] *E. g.*, Iacono & Lykken, The Case Against Polygraph Tests, in Faigman 608–609; Raskin, Honts, & Kircher, A Response to Professors Iacono and Lykken, in Faigman 621; Honts & Perry 362; Abrams, The Complete Polygraph Handbook, at 187–188, 191.

[23] See, *e. g.*, Judge Gonzalez's careful attention to the relevance inquiry in the proceedings on remand from the Court of Appeals decision in *Piccinonna.* 729 F. Supp. 1336 (SD Fla. 1990).

specific evidence. But such questions are properly addressed in adversary proceedings; they fall far short of justifying a blanket exclusion of this type of expert testimony.

There is no legal requirement that expert testimony must satisfy a particular degree of reliability to be admissible. Expert testimony about a defendant's "future dangerousness" to determine his eligibility for the death penalty, even if wrong "most of the time," is routinely admitted. *Barefoot* v. *Estelle*, 463 U. S. 880, 898–901 (1983). Studies indicate that handwriting analysis, and even fingerprint identifications, may be less trustworthy than polygraph evidence in certain cases.[24] And, of course, even highly dubious eyewit-

---

[24] One study compared the accuracy of fingerprinting, handwriting analysis, polygraph tests, and eyewitness identification. The study consisted of 80 volunteers divided into 20 groups of 4. Fingerprints and handwriting samples were taken from all of the participants.

In each group of four, one person was randomly assigned the role of "perpetrator." The perpetrator was instructed to take an envelope to a building doorkeeper (who knew that he would later need to identify the perpetrator), sign a receipt, and pick up a package. After the "crime," all participants were given a polygraph examination.

The fingerprinting expert (comparing the original fingerprints with those on the envelope), the handwriting expert (comparing the original samples with the signed receipt), and the polygrapher (analyzing the tests) sought to identify the perpetrator of each group. In addition, two days after the "crime," the doorkeeper was asked to pick the picture of the perpetrator out of a set of four pictures.

The results of the study demonstrate that polygraph evidence compares favorably with other types of evidence. Excluding "inconclusive" results from each test, the fingerprinting expert resolved 100% of the cases correctly, the polygrapher resolved 95% of the cases correctly, the handwriting expert resolved 94% of the cases correctly, and the eyewitness resolved only 64% of the cases correctly. Interestingly, when "inconclusive" results were included, the polygraph test was more accurate than any of the other methods: The polygrapher resolved 90% of the cases correctly, compared with 85% for the handwriting expert, 35% for the eyewitness, and 20% for the fingerprinting expert. Widacki & Horvath, An Experimental Investigation of the Relative Validity and Utility of the Polygraph Technique and Three Other Common Methods of Criminal Identification, 23 J. Forensic Sciences 596, 596–600 (1978); see also Honts & Perry 365.

ness testimony is, and should be, admitted and tested in the crucible of cross-examination. The Court's reliance on potential unreliability as a justification for a categorical rule of inadmissibility reveals that it is "overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U. S., at 596.[25]

---

[25] The Government argues that there is a widespread danger that people will learn to "fool" the polygraph, and that this possibility undermines any claim of reliability. For example, the Government points to the availability of a book called Beat the Box: The Insider's Guide to Outwitting the Lie Detector. Tr. of Oral Arg. 53; Brief for United States 25, n. 10. Beat the Box, however, actually cuts against a *per se* ban on polygraph evidence. As the preface to the book states:

"Dr. Kalashnikov [the author] is a polygraph professional. If you go up against him, or someone like him, he'll probably catch you at your game. That's because he knows his work and does it by the book.

"What most people don't realize is that there are a lot of not so professional polygraph examiners out there. It's very possible that you may be tested by someone who is more concerned about the number of tests he will run this week (and his Christmas bonus) than he is about the precision of each individual test.

. . . . .

"Remember, the adage is that you can't beat the polygraph system but you can beat the operator. This book is gleefully dedicated to the idea of a sporting chance." V. Kalashnikov, Beat the Box: The Insider's Guide to Outwitting the Lie Detector (1983) (preface); *id.,* at 9 ("[W]hile the system is all but unbeatable, you can surely beat the examiner").

Thus, Beat the Box actually supports the notion that polygraphs are reliable when conducted by a highly trained examiner—like the one in this case.

Nonetheless, some research has indicated that people can be trained to use "countermeasures" to fool the polygraph. See, *e. g.,* Honts, Raskin, & Kircher, Mental and Physical Countermeasures Reduce the Accuracy of Polygraph Tests, 79 J. Applied Psychology 252 (1994). This possibility, however, does not justify a *per se* ban. First, research indicates that individuals must receive specific training before they can fool the polygraph (*i. e.,* information alone is not enough). Honts, Hodes, & Raskin, Effects

*The Role of the Jury*

It is the function of the jury to make credibility determinations. In my judgment evidence that tends to establish either a consciousness of guilt or a consciousness of innocence may be of assistance to the jury in making such determinations. That also was the opinion of Dean Wigmore:

> "Let the accused's whole conduct come in; and whether it tells for consciousness of guilt or for consciousness of innocence, let us take it for what it is worth, remembering that in either case it is open to varying explanations and is not to be emphasized. Let us not deprive an innocent person, falsely accused, of the inference which common sense draws from a consciousness of innocence and its natural manifestations." 2 J. Wigmore, Evidence § 293, p. 232 (J. Chadbourn rev. ed. 1979).

There is, of course, some risk that some "juries will give excessive weight to the opinions of a polygrapher, clothed as they are in scientific expertise," *ante*, at 313–314. In my judgment, however, it is much more likely that juries will be guided by the instructions of the trial judge concerning the credibility of expert as well as lay witnesses. The strong presumption that juries will follow the court's instructions, see, *e. g., Richardson* v. *Marsh*, 481 U. S. 200, 211 (1987), applies to exculpatory as well as inculpatory evidence. Com-

---

of Physical Countermeasures on the Physiological Detection of Deception, 70 J. Applied Psychology 177, 185 (1985); see also Honts, Raskin, Kircher, & Hodes, Effects of Spontaneous Countermeasures on the Physiological Detection of Deception, 16 J. Police Science and Administration 91, 93 (1988) (spontaneous countermeasures ineffective). Second, as countermeasures are discovered, it is fair to assume that polygraphers will develop ways to detect these countermeasures. See, *e. g.,* Abrams & Davidson, Counter-Countermeasures in Polygraph Testing, 17 Polygraph 16, 17–19 (1988); Raskin, Honts, & Kircher, The Case for Polygraph Tests, in Faigman 577–578. Of course, in any trial, jurors would be instructed on the possibility of countermeasures and could give this possibility its appropriate weight.

mon sense suggests that the testimony of disinterested third parties that is relevant to the jury's credibility determination will assist rather than impair the jury's deliberations. As with the reliance on the potential unreliability of this type of evidence, the reliance on a fear that the average jury is not able to assess the weight of this testimony reflects a distressing lack of confidence in the intelligence of the average American.[26]

## Collateral Litigation

The potential burden of collateral proceedings to determine the examiner's qualifications is a manifestly insufficient justification for a categorical exclusion of expert testimony. Such proceedings are a routine predicate for the admission of any expert testimony, and may always give rise to searching cross-examination. If testimony that is critical to a fair determination of guilt or innocence could be excluded for that reason, the right to a meaningful opportunity to present a defense would be an illusion.

It is incongruous for the party that selected the examiner, the equipment, the testing procedures, and the questions asked of the defendant to complain about the examinee's burden of proving that the test was properly conducted. While there may well be a need for substantial collateral proceedings when the party objecting to admissibility has a basis for questioning some aspect of the examination, it seems quite obvious that the Government is in no position to challenge

---

[26] Indeed, research indicates that jurors do not "blindly" accept polygraph evidence, but that they instead weigh polygraph evidence along with other evidence. Cavoukian & Heslegrave, The Admissibility of Polygraph Evidence in Court: Some Empirical Findings, 4 Law and Human Behavior 117, 123, 127–128, 130 (1980) (hereinafter Cavoukian & Heslegrave); see also Honts & Perry 366–367. One study found that expert testimony about the limits of the polygraph *completely eliminated* the effect of the polygraph evidence" on the jury. Cavoukian & Heslegrave 128–129 (emphasis added).

the competence of the procedures that it has developed and relied upon in hundreds of thousands of cases.

In all events the concern about the burden of collateral debates about the integrity of a particular examination, or the competence of a particular examiner, provides no support for a categorical rule that requires exclusion even when the test is taken pursuant to a stipulation and even when there has been a stipulation resolving all potential collateral issues. Indeed, in this very case there would have been no need for any collateral proceedings because respondent did not question the qualifications of the expert who examined him, and surely the Government is in no position to argue that one who has successfully completed its carefully developed training program[27] is unqualified. The interest in avoiding burdensome collateral proceedings might support a rule prescribing minimum standards that must be met before any test is admissible,[28] but it surely does not support the blunderbuss at issue.[29]

## IV

The Government's concerns would unquestionably support the exclusion of polygraph evidence in particular cases, and may well be sufficient to support a narrower rule designed to respond to specific concerns. In my judgment, however,

---

[27] See n. 5, *supra.*

[28] See N. M. Rule Evid. § 11–707.

[29] It has been suggested that if exculpatory polygraph evidence may be adduced by the defendant, the prosecutor should also be allowed to introduce inculpatory test results. That conclusion would not be dictated by a holding that vindicates the defendant's Sixth Amendment right to summon witnesses. Moreover, as noted above, studies indicate that exculpatory polygraphs are more reliable than inculpatory ones. See n. 22, *supra.* In any event, a concern about possible future legal developments is surely not implicated by the narrow issue presented by the holding of the Court of Appeals for the Armed Forces in this case. Even if it were, I can see nothing fundamentally unfair about permitting the results of a test taken pursuant to stipulation being admitted into evidence to prove consciousness of guilt as well as consciousness of innocence.

those concerns are plainly insufficient to support a categorical rule that prohibits the admission of polygraph evidence in all cases, no matter how reliable or probative the evidence may be. Accordingly, I respectfully dissent.