**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0201n.06

No. 08-1909

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Mar 31, 2010**
LEONARD GREEN, Clerk

DAVID HUDSON,                                   )
                                                )
     **Petitioner-Appellant,**                 )
                                                )
v.                                              )
                                                )    ON APPEAL FROM THE
CINDI CURTIN, Warden,                           )    UNITED STATES DISTRICT
                                                )    COURT FOR THE EASTERN
     **Respondent-Appellee,**                  )    DISTRICT OF MICHIGAN
                                                )
MICHIGAN DEPARTMENT OF                          )
CORRECTIONS; PATRICIA                           )        **O P I N I O N**
CARUSO, Director, MDOC;                         )
GOVERNER OF MICHIGAN,                           )
                                                )
     **Respondents.**                          )
_____ )

Before:  SILER, MOORE, and CLAY, Circuit Judges.

KAREN NELSON MOORE, Circuit Judge.  Petitioner-Appellant David Hudson appeals the district court's denial of his petition for a writ of habeas corpus.  On appeal, Hudson argues that the Michigan state courts unreasonably found that he did not have a constitutional right to present during his defense a videotape of an alibi witness's police interrogation and that his sentence was not in violation of *Blakely v. Washington*, 542 U.S. 296 (2004).  For the reasons stated below, we **AFFIRM** the district court's judgment.

# I. BACKGROUND

On June 16, 2003, Hudson was charged in Michigan state court with one count of armed robbery and one count of malicious destruction of a building causing less than $200 in damages. The charges related to an incident on the night of April 18, 2003, in which Hudson allegedly robbed the cashier of a local party-supply store at gunpoint and later damaged the cell in which he was being held. During the trial, the state presented a considerable amount of evidence to the jury that included (among other things):

- The testimony of the victim, who identified Hudson as the robber after reviewing the security tapes,
- The testimony of Hudson's parole officer, who identified the voice on the security camera as being that of Hudson,
- The testimony of two individuals who claim that Hudson confessed to committing the robbery,
- Testimony regarding various inculpatory statements Hudson allegedly made to companions when stopped by the police, and
- The testimony of Hudson's alleged accomplice (though this testimony contradicted a prior statement).

As part of its case-in-chief, the defense presented two alibi witnesses, one of whom was Hudson's girlfriend, Melissa Worley. Worley testified that, on the day in question, she returned to her home after work at about 5:00 p.m., talked with Hudson for about an hour and a half at her house, dropped him off at the home of Katrina Kostrzewa sometime around 6:30 or 7:00 p.m., and did not see Hudson for the rest of the evening. Furthermore, Kostrzewa testified that Hudson spent the entire night with her, and that Kostrzewa's home was approximately a thirty-five minute drive from the crime scene.

The state tried to impeach Worley's testimony in a number of ways. For instance, on cross-examination, the prosecutor asked Worley whether she ever told a detective from the sheriff's

2

department that she actually went to her sister's home around 4:00 p.m. and remained there until 8:00 p.m. Worley denied this, claiming that she visited her sister the following morning. The prosecutor also asked whether Worley lied to the police when she and Hudson were stopped by the police by falsely claiming that Hudson's name was David Pike. This she admitted. Worley also admitted that she was still dating Hudson, visited him regularly in prison, and had discussed his case with him.

As part of its rebuttal, the state called officer John Robertson, the detective who had interviewed Worley. He confirmed that Worley had told him that, on the day in question, she was at her sister's home from 4:00 p.m. until 8:00 p.m. On cross-examination, Hudson's attorney sought to introduce into evidence a copy of the videotape of Worley's police interview. The trial judge excused the jury and proceeded to watch the tape. The judge then asked Hudson's attorney to explain how the videotape was inconsistent with Robertson's testimony. Hudson's attorney admitted that the videotape was not inconsistent, but argued that it was relevant to showing that Robertson had an "intimidating" demeanor while interviewing Worley. Dist. Ct. Doc. 11-12 (Trial Tr. 10/28/03 (Vol. II) at 46). Therefore, Hudson's attorney argued, the videotape would allow him to show that Robertson "was intimidating [Worley] to come up with the answers she did." *Id.* at 47. The prosecution objected on the grounds that there were statements in the videotape that could be unfairly prejudicial to Hudson, such as a reference to a polygraph examination[1] and also reference to the fact that an armed-robbery conviction could result in life imprisonment. The trial judge agreed

---

[1]The record is unclear as to who took the polygraph examination or what the results were.

to exclude the videotape because of these statements[2] and also because the videotape was not inconsistent with Robertson's testimony. *Id.* at 48. Hudson responded by offering to "waive any matters that might be prejudicial to [Hudson] in that tape," *id.*, but the judge still refused to admit it, explaining that:

> "I don't have to accept the waiver. . . . I can't ignore the law and I won't ignore it – even with – and I appreciate Mr. Hudson's waiver of that. But I am not going to have this go up to the Court of Appeals saying what was going on in that courtroom."

*Id.* at 49. The judge did, however, permit Hudson's attorney to cross-examine Robertson regarding "the types of things that he said to [Worley]," which Hudson's attorney proceeded to do. *Id.* During the cross-examination, Robertson denied making any intimidating statements, although he did admit to telling Worley that she could be charged as an accessory if she lied.

The jury subsequently convicted Hudson on both counts. At the sentencing hearing, the trial judge determined that the sentencing guidelines range for Hudson's minimum sentence was between 126 and 420 months of imprisonment, based in part on the fact that Hudson was a fourth habitual offender and also based on factual findings made at the sentencing hearing. The judge ultimately sentenced Hudson to fifteen to forty years of imprisonment.

Hudson then appealed his case to the Michigan Court of Appeals. *People v. Hudson*, No. 252851, 2005 WL 659211 (Mich. Ct. App. Mar. 22, 2005) (unpublished opinion). Of the many issues he raised on appeal, two are relevant to this case: he claimed that the exclusion of the videotape of Worley's interrogation violated his federal constitutional right to present a defense, and

---

[2]The trial judge never specifically stated which statements in the videotape concerned her or what kind of prejudice it was that she was trying to prevent. Rather, she simply referred to "some of the statements made in [the videotape]." Doc. 11-12 (Trial Tr. 10/28/03 (Vol. II) at 48). However, presumably she had the same concerns as the prosecutor—i.e., possible prejudice to Hudson from the statements referring to the polygraph examination and the potential life sentence.

4

he claimed that his sentence violated *Blakely v. Washington*, 542 U.S. 296 (2004), insofar as judge-made factual findings raised his sentencing guidelines range. The court of appeals affirmed the conviction. With respect to the first claim, it agreed with the trial judge that the videotape was prejudicial to Hudson and yet was only "marginally relevant." *Hudson*, 2005 WL 659211, at *4. It further noted that Hudson could have elicited whatever information was on the videotape simply by questioning Worley or by cross-examining Robertson. With respect to the *Blakely* claim, the court relied on *People v. Claypool*, 684 N.W.2d 278 (Mich. 2004), in which the Michigan Supreme Court found that *Blakely* did not apply to Michigan's sentencing regime because, in Michigan, a defendant's maximum sentence is set by statute. *Hudson*, 2005 WL 659211, at *6; *Claypool*, 684 N.W.2d at 286 n.14. Hudson later appealed to the Michigan Supreme Court, which denied his appeal. *People v. Hudson*, 703 N.W.2d 811 (Mich. 2005).

On December 27, 2006, Hudson filed this habeas action, again raising his right-to-present-a-defense and *Blakely* claims, among others. On June 13, 2008, the district court denied Hudson's petition. The district judge later granted a certificate of appealability ("COA") as to Hudson's right-to-present-a-defense claim, but not as to his *Blakely* claim. This court, however, subsequently granted a COA as to the *Blakely* claim.

## II. ANALYSIS

### A. Standard of Review

"In a habeas corpus proceeding, this Court reviews a district court's legal conclusions *de novo* and its factual findings for clear error." *Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009) (internal quotation marks omitted), *cert. denied.*, -- U.S. --, 130 S. Ct. 742 (2009). Furthermore, because Hudson's petition was filed after April 24, 1996, our analysis is governed by the

5

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir. 2009). Under ADEPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Under the 'contrary to' clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Terry Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Furthermore, "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. With respect to whether a state-court decision is unreasonable, "[t]he question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Irick v. Bell*, 565 F.3d 315, 320 (6th Cir. 2009) (internal quotation marks omitted).

6

**B. Hudson's Right to Present a Defense**

Hudson argues that the Michigan state courts unreasonably applied Supreme Court precedent when they found that he did not have a constitutional right to offer the videotape of Robertson's interrogation of Worley into evidence. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations and internal quotation marks omitted). At the same time, however, this right is not "unlimited," as "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). In particular, the right to present a defense is unconstitutionally compromised only "by evidence rules that infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation marks omitted); *Varner v. Stovall*, 500 F.3d 491, 499 (6th Cir. 2007).

The trial judge's exclusion of the videotape was in furtherance of state interests that were not arbitrary. Although the videotape itself was not included in the record below, Hudson does not dispute that the videotape contained at least one statement regarding a polygraph examination and also a statement indicating that an armed-robbery conviction could result in life imprisonment. Excluding polygraph results is a legitimate purpose given the questionable reliability of such results. *See Scheffer*, 523 U.S. at 305 (holding that an absolute prohibition on polygraph evidence does not deprive a defendant of her right to present a defense); *Amunga v. Jones*, 51 F. App'x 532, 540 (6th Cir. 2002) (unpublished opinion) ("It cannot be said that [a] rule against polygraph testimony is

7

arbitrary or disproportionate to the purpose of excluding unreliable evidence."), *cert. denied*, 538 U.S. 1040 (2003). Furthermore, Michigan state courts could have reasonably concluded that the state had an interest in preventing the jury from learning the maximum sentence to which Hudson would be exposed if convicted, as this information could have caused the jury to render a verdict on improper grounds. If the videotape was extremely probative, then perhaps this prejudice would be small by comparison. Nonetheless, Hudson conceded at trial that Robertson's testimony was not inconsistent with the videotape, meaning the tape would have had relatively little impeachment value.

Hudson notes that it was he who sought to introduce the videotape, making strange the decision to exclude it on the grounds that it might unfairly prejudice him, particularly when he explicitly offered to waive any prejudice. A trial judge's responsibility for ensuring a fair trial and preserving the integrity of the proceedings in her courtroom, however, extends beyond the wishes and motions of the litigants. *Cf. United States v. Lattner*, 385 F.3d 947, 960 (6th Cir. 2004) ("A district court judge has the authority to control the courtroom proceedings . . . and both the prosecution and defense [are] subject to the court's intercession in the conduct of examination of witnesses and the presentation of evidence when warranted."), *cert. denied*, 543 U.S. 1095 (2005). If the trial judge here were concerned that the introduction of the videotape would obstruct the jury's task of discerning the truth, then her decision to exclude the videotape despite Hudson's waiver would not be arbitrary. *See Amunga*, 51 F. App'x at 540 n.8 (suggesting that a defendant cannot waive the kind of prejudice created by the admission of polygraph testimony as this goes to "the jury's 'core function of making credibility determinations in criminal trials'" (quoting *Scheffer*, 523 U.S. at 312-13)).

The trial judge's ruling also was not "disproportionate" to the purpose of excluding unfairly prejudicial material. Normally, an evidentiary rule is disproportionate when it excludes a broad category of evidence without allowing for an individualized determination. *See, e.g., Rock v. Arkansas*, 483 U.S. 44, 62 (1987) (holding that a per se rule excluding hypnotically refreshed testimony is unconstitutional); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("[T]he hearsay rule may not be applied mechanistically"). Here, by contrast, the trial judge viewed the videotape and decided that its probative value was outweighed by its risk of unfair prejudice. Such an individualized determination avoids the kind of "mechanistic" evidentiary ruling with which courts have traditionally been concerned. *See Alley v. Bell*, 307 F.3d 380, 395 (6th Cir. 2002) (concluding that the exclusion of the videotape defendant sought to offer into evidence was proper because the judge "made an individual determination—after watching the videos and based on the facts specific to [the petitioner's] case—that the likely prejudice from admitting the tapes outweighed their probative value"), *cert. denied*, 540 U.S. 839 (2003). Hudson argues, however, that the trial judge should have allowed the videotape to be edited because the prejudicial remarks were isolated. Appellant Br. at 23-24. The trial judge, however, specifically asked Hudson's attorney whether he "want[ed] the *entire* tape admitted," to which he replied "Yes." Doc. 11-12 (Trial Tr. 10/28/03 (Vol. II) at 48) (emphasis added). Thus, not only did Hudson fail to ask that the videotape be redacted, *see Amunga*, 51 F. App'x at 539 n.6 (refusing to consider the possibility of admitting only portions of a videotape when "[d]efense counsel did not make such a motion"), but also Hudson affirmatively indicated that he did not want the tape redacted.[3]

---

[3]Hudson also argues that the trial judge could have mitigated any prejudice with a curative instruction. Appellant Br. at 23-24. Again, however, it does not appear that Hudson's attorney ever proposed this idea.

9

Finally, the exclusion of the videotape did not infringe upon Hudson's "weighty interest[s]." *Scheffer*, 523 U.S. at 308. This factor normally requires that the exclusion "undermine[] fundamental elements of the defendant's defense." *Id.* at 315. The trial judge's exclusion of the videotape did not have this effect. As discussed above, the videotape's relevance was marginal, as it was not inconsistent with Robertson's testimony. Furthermore, as the state court of appeals correctly noted, Hudson still had other means of probing what occurred during Worley's interrogation, such as by questioning either Worley or Robertson. *See United States v. Lucas*, 357 F.3d 599, 606 (6th Cir. 2004) (concluding that the exclusion of evidence was not a constitutional violation when other means of eliciting the information were available). Indeed, Robertson admitted that he told Worley that she could be charged as an accessory, which presumably substantiated Hudson's theory that Robertson intimidated her. Moreover, even if Worley's testimony was entirely discredited, there was still the testimony of Hudson's other alibi witness, Kostrzewa, whose credibility Robertson's testimony did not implicate. Taking all of this into consideration, we conclude that, even if the videotape might have helped Hudson, there is no indication that its exclusion undermined Hudson's defense.

Therefore, the Michigan state courts did not unreasonably find that Hudson lacked a constitutional right to introduce the videotape of Worley's interrogation into evidence.[4]

---

[4]Even if the exclusion of the videotape were erroneous, we cannot grant habeas relief unless the exclusion "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Ferensic v. Birkett*, 501 F.3d 469, 481 (6th Cir. 2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)). Given that Worley's testimony was already discredited by her admission that she lied to the police, and in light of the otherwise voluminous evidence of Hudson's guilt, any error on the trial court's part did not have a "substantial and injurious effect."

## C. Hudson's *Blakely* Claim

Hudson next argues that his sentence was unconstitutional because his sentencing guidelines range was based upon findings of fact not submitted to a jury. In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. In *Blakely v. Washington*, 542 U.S. 296 (2004), the Court relied on *Apprendi* in invaliding Washington State's sentencing regime insofar as state law authorized a trial judge to depart from the ordinary sentencing range if she found that the defendant acted with "deliberate cruelty." *Blakely*, 542 U.S. at 298. The *Blakely* Court clarified that the "statutory maximum" to which *Apprendi* referred was "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Id.* at 303.

The statutory maximum amount of time for which Hudson could be imprisoned for his crime was life. Mich. Comp. Laws § 769.12(1)(a). The trial judge was required to impose an "indeterminate sentence" whereby she specified the minimum amount of time that Hudson would have to spend in prison before being eligible for parole and also his mandatory release date (if any). Mich. Comp. Laws § 769.12(2). The guidelines determined the range from which the trial judge could select Hudson's *minimum* sentence—that is, the minimum amount of time that Hudson must serve before being eligible for parole. *See* Mich. Comp. Laws §§ 777.61-69 (sentencing grids). The mandatory release date was not dependent upon any factual findings.

Hudson argues that his sentence is unconstitutional because judge-made factual findings raised his guideline range and thereby raised the range of parole-eligibility dates from which the trial

11

judge could have selected. In other words, Hudson contends that judge-made factual findings gave the trial judge the option of imposing a higher minimum sentence than otherwise would have been possible. In *Harris v. United States*, 536 U.S. 545 (2002), however, the Supreme Court, in a plurality opinion, explained that *Apprendi* did not apply to mandatory-minimum sentences. *Harris*, 536 U.S. at 565-66. This distinction between minimum and maximum sentences was again emphasized in *Blakely*. 542 U.S. at 304-05. Hudson's case is arguably distinguishable because, as Hudson points out, under Michigan's unique sentencing scheme, the trial judge has no control over the actual amount of time a defendant will spend in prison, but only establishes a minimum sentence which acts as a boundary on the parole board's discretion. We have previously determined this distinction to be irrelevant, however. *See Arias v. Hudson*, 589 F.3d 315, 317-18 (6th Cir. 2009). Indeed, a panel of this circuit recently found a similar Michigan sentence to be constitutional under *Blakely*, reasoning that the factual findings only affected the "*minimum* sentence applicable . . . as part of an *indeterminate* sentencing scheme." *Montes v. Trombley*, ---F.3d ---, 2010 WL 935369, at *7 (6th Cir. Mar. 17, 2010); *see also Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009).[5]

We note, as we did in *Arias*, that the Supreme Court's grant of certiorari in *United States v. O'Brien*, 130 S. Ct. 49 (2009), may signal a shift in the Court's jurisprudence with respect to minimum sentences. *See Arias*, 589 F.3d at 318. However, we also noted in *Arias* that it is unlikely that any resulting change in the law would be retroactive. *Id.* Thus, we see no need to defer ruling in this case.

---

[5]Both *Montes* and *Chontos* were careful to avoid ruling on *Blakely*'s applicability to Michigan's rules governing "intermediate sanctions." *Montes*, 2010 WL 935369, at *7; *Chontos*, 585 F.3d at 1002 n.3. This caveat is irrelevant for our purposes, however, as Hudson was not eligible for intermediate sanctions. *See* Mich. Comp. Laws § 769.34(4)(a).

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's denial of Hudson's petition for a writ of habeas corpus.