**AFFIRMED and Opinion Filed December 18, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-00489-CR

## MARTIN ARMIJO, JR, Appellant
## V.
## THE STATE OF TEXAS, Appellee

**On Appeal from the 283rd Judicial District Court
Dallas County, Texas
Trial Court Cause No. F-1676053-T**

# MEMORANDUM OPINION
Before Justices Myers, Osborne, and Nowell
Opinion by Justice Osborne

Appellant, Martin Armijo, Jr., was convicted of capital murder. Because the State did not seek the death penalty, appellant was sentenced to life imprisonment without the possibility of parole. On appeal, appellant claims that the trial court erred by excluding several letters written to him while he was in jail awaiting trial by a former girlfriend who was also a witness to the offense. Appellant claims that exclusion of these letters violated his rights to due process by preventing him from presenting a defense and that he was harmed by this error. We affirm.

## Background

Appellant does not challenge the sufficiency of the evidence to support his conviction for capital murder. Consequently, and because the background facts are known to the parties, we recite only those facts relevant to the disposition of this appeal. TEX. R. APP. P. 47.1.

On the evening of July 1, 2016, Dallas Police officers responded to a caller[1] who claimed he had witnessed a murder at 755 Elwayne Avenue in Dallas, Texas. Once at that location, officers could hear yelling coming from a backyard shed. Officers set up a perimeter around the shed.

After dark, officers saw appellant coming out of the shed holding a couple of items. The police told appellant to drop the items. Appellant did so, but then ran behind the shed and out of the yard. The police followed him and he was taken into custody shortly afterwards.

Video footage taken by the police showed a woman, Avigail Villanueva, leaving the shed. She was bleeding from the head and saying "He tried to kill me."

The body of Jonathan Gutierrez was discovered in the shed. He died as a result of multiple blunt and sharp force injuries. There was evidence that appellant had beaten, stabbed, and otherwise tortured Gutierrez for hours before Gutierrez died.

### The Letters

Appellant claims that the trial court erred by excluding several letters written to him by Villanueva while he was in jail awaiting trial. Appellant claims that exclusion of these letters violated his rights to due process and that he was harmed by this error. The State responds that appellant's constitutional claims were not preserved because he failed to object at trial on due process grounds. The State further responds that the trial court correctly excluded the letters because they were not relevant or, in the alternative, that any error is harmless. We agree with the State.

---

[1] The caller proved to be Ricky Moreno, who was later prosecuted for aggravated kidnapping due to his participation in this offense. *Moreno v. State*, 05-18-00271-CR, 2019 WL 4071993 (Tex. App.—Dallas Aug. 29, 2019, pet. granted) (not yet published).

*Avigail Villanueva's testimony*

Villanueva testified that she met Gutierrez when she was thirteen years old and started dating him when she was eighteen years old. The pair ultimately had five children together. They broke up in 2015.

Villanueva also testified that she began using drugs, specifically methamphetamine, when she was twenty years old. She was arrested and convicted three times for drug possession, manufacturing, and delivering. The drug usage and offenses caused her to lose custody of her children. Her four oldest children went into her mother's custody while Gutierrez's mother took custody of her youngest child.

Within days of her breakup with Gutierrez, Villanueva began dating appellant. Villanueva met appellant at Thomas Johnson's house at 755 Elwayne Avenue. Johnson was dealing drugs. People would come to his house and use drugs in some of the outside structures on that property. In particular, Villanueva and appellant would use drugs, heroin and methamphetamine, together and get high at Johnson's house.

Appellant became aware that Villanueva used to date Gutierrez. Appellant told Villanueva that when he saw Gutierrez he was going to beat him up. Appellant told Villanueva that when he beat up Gutierrez she was not to cry or show any remorse.

On July 1, 2016, Villanueva made contact with appellant; she wanted to "score some dope" but did not want to run into him in the neighborhood. Appellant sent her a text saying that he had Gutierrez with him. Two of these texts read as follows: "I've been flicking ur bd for like two hours;" "I fucked him up d homies holding for me." Villanueva responded as follows: "Already daddy thank u im not at d house im wl my mom and d kids as soon as we done ill tell my mom 2 take me on that side." Appellant then sent texts saying "I'm gonna hold him for 2" and "Get over here." Villanueva stopped replying to these texts.

Appellant later called Villanueva, said he had Gutierrez, and had been beating Gutierrez for a few hours. Villanueva testified that she heard appellant hit Gutierrez; she heard Gutierrez scream and tell appellant to stop. Villanueva testified that she felt guilty and wished she had not told appellant about Gutierrez.

When appellant asked Villanueva where she was, she lied and told him she was at her mother's house. Appellant told her that he was on his way to pick her up. Villanueva then called her mother and told her to look around when she got home to make sure there were no cars that she did not recognize because appellant was at the house.

Appellant called Villanueva again and told her to come outside. Villanueva lied to appellant again and told him that she was not at her mother's house but was with her mother. Villanueva told him that when her mother "was done with what she was doing" her mother would drop her off at appellant's location. Villanueva later called appellant back and told him that her mother had dropped her at a gas station. Appellant told "Ricky," *i.e.*, Ricky Moreno, to go and get Villanueva.

Moreno picked Villanueva up and they went to Johnson's house. When she walked into the room where Gutierrez was, Villanueva noticed that the "whole room was tore up," Gutierrez was on the floor, his arms were "taped up," and there was blood on the walls. Gutierrez was alive at this point. Appellant tried to hand her a wooden bat and told her to hit Gutierrez with it. When Villanueva refused, appellant began hitting Gutierrez with the bat. Gutierrez was telling appellant to stop, screaming, and holding up his arms. Villanueva claimed that while this was going on she was just sitting down; she did not try to stop appellant because she was scared. Appellant stopped hitting Gutierrez with the bat and poured bleach on him. She also saw appellant throw a knife at Gutierrez repeatedly and hit Gutierrez with the knife. When appellant told Gutierrez to get up and he did not respond, Villanueva knew that Gutierrez was dead.

–4–

Villanueva admitted that she told appellant a lot of stories about Gutierrez in the few months that she and appellant were together. She was angry at Gutierrez because his mother had her youngest child and she was not getting to see that child as much as she would like. She was also angry that she could not see her other children who were with her parents because they did not like what she was doing with her life. She eventually broke up with Gutierrez.

While Villanueva lived in different places with appellant in March through May of 2016, she broke up with him at the end of June, 2016. She denied that this was related to appellant going to Alabama to see another woman and his newborn son, though she did not like that. Villanueva claimed that she broke up with appellant because he had beaten her badly. After that beating, she crawled out of a window because she was scared for her life. She hid in a neighbor's backyard and got a ride to her mother's house. While she did not tell her mother about the beating, she called the police. Villanueva did not tell the police about the beating, but rather told them that appellant had sent her a text saying that he knew where she was. She did not see appellant again until the night he murdered Gutierrez.

Villanueva admitted that appellant told her the next time he saw Gutierrez he was "going to put hands on him."

After Gutierrez died, there were rumors in the neighborhood that Villanueva had set him up. That made her mad. She denied that she tried to incite appellant to attack Gutierrez.

### *Offer and Exclusion of the Letters*

During cross-examination, Villanueva was asked to identify six letters as letters that she wrote to appellant after his arrest. The State lodged multiple objections to these letters when defense counsel tried to question Villanueva about their contents. A hearing was held outside the presence of the jury.

During that hearing, the State objected to admission of the letters on grounds of hearsay and relevance. Defense counsel responded that the letters went to Villanueva's credibility and also to appellant's state of mind regarding his relationship with Villanueva and the influence Villanueva had on appellant's state of mind "at the time that all this stuff was going on." Defense counsel admitted that there was nothing in the letters about what happened in the room in which Gutierrez was killed other than "she takes the blame for it."

The trial court questioned defense counsel about the relevancy of the letters. Defense counsel responded that "it does go to her credibility, because I do believe . . . that she has answered questions, but she's answered a great deal of leading questions because she doesn't want to answer questions. And so she's been led by the State to answer questions they ask the way they want her to ask (sic) them." Defense counsel argued that Villanueva's testimony left a false impression. The trial court stated that it had not heard anything that was relevant to the State's case in chief but suggested that defense counsel continue questioning Villanueva, which counsel did. The trial court did not rule on the admissibility of the letters at that time.

After Villanueva's testimony concluded, a hearing was held outside of the presence of the jury during which defense counsel again attempted to have the letters admitted into evidence. Defense counsel argued that the letters were necessary to refute the false impression that Villanueva had broken up with appellant because he had assaulted her and she was afraid of him and also that this was why she took no action to stop him during the murder. Counsel argued that Villanueva's letters to appellant, in which she professed her love for him and her desire to be with him in flowery language,[2] went to the credibility of her testimony:

---

[2] Appellant's brief to this Court gives a good synopsis of the contents of Villanueva's letters to appellant:

> Her letters were filled with florid language, expressing thanks to Martin that she had her children back in her life . . . telling him she "love[d] him so," . . . but also expressing discontent with Martin's decision to bring the mother of his child to town combined with expressing her desire to see him

–6–

[DEFENSE COUNSEL]: And I think the jury is entitled to use that to determine whether she's a credible witness when she says she was beaten by him and that's why she left and that's why she didn't act that day in the room, is because she was scared of him. They're entitled to assess her credibility based on those.

The State argued that the letters, written months after the murder, were not relevant to anything that took place on the day of the murder and would serve only to confuse the jury. The State also argued that the defense had not established the requisite predicate under Tex. R. Evid. 613 and that the letters were hearsay.

The defense argued that because Villanueva was the only witness testifying for the State that was present at the time of the murder, her credibility was crucial and the jury had a right to assess "whether or not she's got another agenda." Specifically, the letters indicated that Villanueva was upset because appellant had gone to Alabama to see another woman, not because he had beaten her.

After hearing the arguments of counsel, the trial court ruled as follows:

[THE COURT]: All right I've looked at these letters. They're dated 11/1/16, 11/3/16, 11/26/16, 2/20/17, 6/6/17 and 3/16/17. Now, if I recall from the testimony, Ms. McClung, in your questioning of Ms. Villanueva, you has asked her questions about possible motives of why this could have happened, that Ms. Villanueva was angry at Mr. Armijo because of this woman in Alabama and the brand-new child, and that's why this might have been a setup by Ms. Villanueva with Ms. (sic) Armijo.

[DEFENSE COUNSEL]: That's what his friends thought.

[THE COURT]: Okay. Well, I think through your questioning you've insinuated that in your questioning, Ms. McClung. And through her testimony, she did tell – through her testimony, she was angry about it. Okay? She's not denying that.

_____

and promise of love, . . . She talked about other women in his life but reaffirmed her love for him. . . . She addressed neighborhood talk that she set Jonathan up and a scary experience she had with some of Jonathan's friends who believed it. . . . She mentioned Jonathan's father wanting to have her over to talk. . . . In another letter, she asked Martin's permission to tattoo his name on her ring finger. . . In a final letter, she expressed that she had been upset at his last letter, but that she could not stay mad at him because she loved him too much.

[DEFENSE COUNSEL]: Right.

[THE COURT]: And then, though, you gave this impression that there was this support – the reason that all this happened was because she was angry at this woman, angry at Martin because – Armijo (sic), but that has nothing to do about Gutierrez. The beating that she took that day was because you gave this impression of this conspiracy of hers with Mr. Armijo, and that's why that one particular incident was allowed to be described in regards to this testimony.

As far as these letters are concerned, I don't believe they're relevant. They are four months after this offense. It doesn't address anything in regards to this case in chief, therefore, I'm not going to allow them in and I'm not going to allow any more testimony in regards to these letters. All right?

The letters were thereafter admitted for record purposes only.

### *Preservation*

In order to preserve an issue for appellate review, the complaining party must make a specific objection and obtain a ruling on that objection. TEX. R. APP. P. 33.1(a). The objections raised at trial and presented to the trial court for a ruling must comport to the issues raised on appeal. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *see also Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014) (stating "[w]e are not hyper-technical in examination of whether error was preserved, but the point of error on appeal must comport with the objection made at trial"). An appellate court may not reverse the trial court's decision on a legal theory not presented to the trial court by the complaining party. *Hailey v. State*, 87 S.W.3d 118, 121-122 (Tex. Crim. App. 2002). Failure to object at trial may waive even constitutional errors. *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014).

In this appeal, appellant claims that the trial court violated his constitutional rights to due process by excluding the letters which were relevant to support his defensive theory at trial that Villanueva delivered the "killing blows" to Gutierrez and to rebut the State's theory that appellant acted alone.

At trial, however, appellant did not object to the exclusion of the letters on the grounds of a constitutional due process violation. Rather, counsel for appellant argued that the letters were admissible because (1) they cast doubt on Villanueva's credibility, (2) went to appellant's state of mind regarding his relationship with Villanueva and the influence Villanueva had on his state of mind, and (3) were necessary to refute the false impression that Villanueva had broken up with appellant because he had assaulted her, she was afraid of him, and that was why she took no action to stop him during the murder.

Appellant never argued to the trial court that the letters supported his defensive theory that Villanueva actually killed Gutierrez. Nor did appellant argue that the exclusion of those letters violated his due process rights to present a defense. Consequently, appellant's arguments on appeal fail to comport with the objections he raised at trial. Because appellant did not object at trial to the letters on the grounds he now urges on appeal, he has failed to preserve error, if any, for our review.

### Exclusion of the Letters was Not an Abuse of Discretion

Even if we were to find that appellant preserved error for our review, we would not find that the trial court abused its discretion by excluding the letters.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A court abuses its discretion when its decision falls outside the zone of reasonable disagreement. *Id*. at 83. Before we as a reviewing court may reverse the trial court's decision, we must find that the trial court's ruling was so clearly wrong as to lie outside the zone of reasonable disagreement. *Id*.; *see also Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

The Supreme Court of the United States has explicitly stated that there is no absolute constitutional right to present favorable evidence:

> A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. A defendant's interest in presenting such

evidence may thus "bow to accommodate other legitimate interests in the criminal trial process." As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.

*United States v. Scheffer*, 523 U.S. 303, 308 (1998)(citations omitted); *see also Potier v. State*, 68 S.W.3d 657, 659–60 (Tex. Crim. App. 2002)(quoting *Scheffer*).

Courts are "free to apply evidentiary rules that are not arbitrary and unjustified," and the exclusion of evidence that is not "relevant, material, important evidence" does not "offend the Constitution." *Potier,* 68 S.W.3d 662. The rules regarding relevancy are neither arbitrary nor unjustified, nor were they applied by this trial court in an "arbitrary" way that was "disproportionate" to the purposes they were designed to serve. *Id*. at 659; *see also Henley*, 493 S.W.3d at 96.

Here, in excluding the letters, the trial court said: "I don't believe they're relevant. They are four months after this offense. It doesn't address anything in regards to this case in chief, therefore, I'm not going to allow them in." As the trial court judge correctly stated, the letters, which were dated between November 1, 2016 and March 16, 2017, were written four to eight months after the murder. The letters do not directly mention the murder. Appellant's assertions that Villanueva's expressions of love for him, and gratitude to him, do not support his suggestion that she killed Gutierrez. To the contrary, if anything, Villanueva's expressions of gratitude in the letters would support the theory that she was grateful, after the fact, that appellant killed Gutierrez for her.

Further, the contents of the letters do not directly undermine Villanueva's credibility. Villanueva admitted that she told appellant a lot of stories about Gutierrez in the few months that she and appellant were together. She was extensively cross-examined by defense counsel at trial

about her relationship with appellant and her role, if any, in Gutierrez's death. While she was never questioned directly about whether she participated in the brutal assault on Gutierrez which resulted in his death, she admitted that appellant offered her the wooden bat and told her to hit Gutierrez.

The trial court correctly found that the letters were not relevant to the issues of appellant's intent to kill Gutierrez and/or his actions in beating and stabbing Gutierrez to death.

### *Error, if Any, is Harmless*

Even if we were to find that exclusion of the letters was erroneous, the error is harmless.

Exclusion of the letters did not prevent appellant from presenting a defense. Appellant used Villanueva's testimony to support his theory that she was actually the mastermind behind appellant kidnapping and assaulting Gutierrez. Appellant also referenced a number of text messages exchanged between appellant and Villanueva during the time that appellant was beating Gutierrez in an effort to show that it was Villanueva who "set this thing up" whereby appellant murdered Gutierrez. The jury did not find appellant's defense credible in light of the record as a whole.

We cannot say that exclusion of the letters contributed to the conviction or punishment nor can we say that exclusion of the letters affected appellant's substantive rights. TEX. R. APP. P. 44.2(a), (b).

We overrule appellant's issue.

### **Conclusion**

The trial court's judgment is affirmed.

/Leslie Osborne/
LESLIE OSBORNE
JUSTICE

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)
180489F.U05

–11–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MARTIN ARMIJO, JR, Appellant

No. 05-18-00489-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 283rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1676053-T.
Opinion delivered by Justice Osborne.
Justices Myers and Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered December 18, 2019